**LINK: 131**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

| Present: The Honorable | **GARY ALLEN FEESS** | | |
|---|---|---|---|
| Stephen Montes Kerr | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**     (In Chambers)

### ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFFS' FOURTH CAUSE OF ACTION

   On June 24, 2014, Plaintiffs filed a motion for partial summary judgment on their fourth cause of action for violations of the National Pollution Discharge Elimination System ("NPDES") numeric effluent limitations based on 36 instances in which Defendants' self-reported monitoring results were in excess of the effluent limits.  (Docket No. 131.)  Defendants opposed on July 28 and Plaintiffs replied on August 4.  (Docket Nos. 156, 161.)  Following a hearing on August 13 regarding new issues raised on reply, the Court granted a discovery continuance and permitted Defendants to submit a sur-reply, which they filed on October 6.  (Docket No. 199.)  The Court heard oral argument on October 20, 2014.  After the hearing, the parties lodged supplemental evidence on October 27, 2014.  (Docket Nos. 226, 233.)  Having reviewed the briefs, supporting documents, and arguments, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for partial summary judgment as to the fourth cause of action.

**I.
BACKGROUND**

   The following facts are taken from the evidence presented in support of and in opposition to the motion.  The facts set forth below are undisputed unless otherwise noted.

   Since December 29, 2006, Magic Mountain LCC ("MMLLC") has owned and operated a 260-acre amusement park in Valencia, California (the "Facility"), which is directly adjacent to the Santa Clara River.  Statement of Undisputed Facts ("SUF") 1.  Six Flags Theme Parks, Inc. ("SFINC"), the predecessor to MMLLC, was a named permit holder and entered into settlement

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

agreements with the State for permit violations at the Facility as late as 2009.[1]  Id.  The Facility discharges wastewater and storm water from three discharge points set forth in MMLLC's NPDES permits: Discharge Points 001, 002, and 003.  (SUF 2.)

The Facility's discharges into the Santa Clara River are regulated by three successive individual NPDES Permits (collectively, the "Individual Permits").  (SUF 4.)  On June 2, 2005, the Regional Water Quality Control Board ("RWQCB") issued SFINC an individual permit, which was amended in 2008.  (SUF 5-6.)  The 2008 amendment was issued to "Magic Mountain, LLC (Former Six Flags Theme Park, Inc.)."  (Docket No. 133-2 [Declaration of Daniel P. Mensher, Ex. 2].)  In 2011, the RWQCB issued an individual permit to MMLLC only.  (SUF 7.)

The Individual Permits contain numeric effluent limitations.  (SUF 8.)  Permit holders are required to monitor the effluent discharged from their facilities and report data regarding pollutants in its discharges to the RWQCB and the EPA.  (SUF 22.)  The following sets forth relevant portions of those reports regarding storm water discharges from 2006 through 2011.

A. **ANNUAL REPORTS**

In the 2006-2007 Annual Report for Storm Water Discharges Associated with Industrial Activities, "Six Flags Magic Mountain" (the dba of MMLLC) reported the following discharges:

- a copper sample of 83 µg/L from Discharge Point 001, taken on April 20, 2007 (SUF 23);
- a copper sample of 41 µg/L from Discharge Point 002, taken on April 20, 2007 (SUF 24);
- a copper sample of 260 µg/L from Discharge Point 003, taken on April 20, 2007 (SUF 25);
- a total suspended solids ("TSS") sample of 420 mg/L from Discharge Point 001, taken on April 20, 2007 (SUF 26); and
- a TSS sample of 220 mg/L from Discharge Point 003, taken on April 20, 2007 (SUF 27).

---

[1] The other two defendants, Six Flags Magic Mountain and Six Flags Entertainment Corporation, were dismissed on August 21, 2014.  (Docket No. 182.)

LINK: 131

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

In the 2007-2008 Annual Report for Storm Water Discharges Associated with Industrial Activities, MMLLC reported the following discharges:

- a TSS sample of 82 mg/L from Discharge Point 003, taken on February 20, 2008 (SUF 28).

In the 2008-2009 Annual Report for Storm Water Discharges Associated with Industrial Activities, MMLLC reported the following discharges:

- a copper sample of 33 µg/L from Discharge Point 001, taken on January 22, 2009 (SUF 29);
- a copper sample of 500 µg/L from Discharge Point 002, taken on February 5, 2009 (SUF 30);
- a TSS sample of 240 mg/L from Discharge Point 001, taken on February 5, 2009 (SUF 31); and
- a TSS sample of 120 mg/L from Discharge Point 003, taken on February 5, 2009 (SUF 32).

In the 2009-2010 Annual Report for Storm Water Discharges Associated with Industrial Activities, MMLLC reported the following discharges:

- a copper sample of 40 µg/L from Discharge Point 001, taken on January 17, 2010 (SUF 33);
- a TSS sample of 110 mg/L from Discharge Poin 001, taken on January 17, 2010 (SUF 34);
- a TSS sample of 86 mg/L from Discharge Point 003, taken on January 17, 2010 (SUF 35);
- two samples of copper at Discharge Point 002 that were 30 µg/L on January 17, 2010 and 40 µg/L on January 26, 2010 (SUF 36);
- two samples of copper at Discharge Point 003 that were 70 µg/L on January 17, 2010 and 100 µg/L on January 26, 2010 (SUF 37); and
- a copper sample of 40 µg/L from Discharge Point 002, taken on January 26, 2010 (SUF 38).

In the 2010-2011 Annual Report for Storm Water Discharges Associated with Industrial Activities, MMLLC reported the following discharges:

LINK: 131

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

- a copper sample of 40 µg/L from Discharge Point 002, taken on December 17, 2010 (SUF 39);
- a copper sample of 70 µg/L from Discharge Point 003, taken on December 17, 2010 (SUF 40);
- a copper sample of 40 µg/L from Discharge Point 002, taken on February 25, 2011 (SUF 41);
- a copper sample of 100 µg/L from Discharge Point 003, taken on February 25, 2011 (SUF 42); and
- a TSS sample of 130 mg/L from Discharge Point 003, taken on February 25, 2011 (SUF 43).

In the 2011-2012 Annual Report for Storm Water Discharges Associated with Industrial Activities, MMLLC reported the following discharges:

- a copper sample of 1,100 µg/L from Discharge Point 002, taken on February 27, 2012 (SUF 48);
- a TSS sample of 200 mg/L from Discharge Point 002, taken on February 27, 2012 (SUF 49);
- a copper sample of 56 µg/L from Discharge Point 002, taken on March 17, 2012 (SUF 50); and
- a copper sample of 79 µg/L from Discharge Point 003, taken on March 17, 2012 (SUF 51).

In the 2012-2013 Annual Report for Storm Water Discharges Associated with Industrial Activities, MMLLC reported the following discharges[2]:

---

[2] Defendants claim that there are disputed facts as to the discharges sampled on February 8, 2013. In particular, the Facility reported copper samples from Discharge Points 002 and 003 with concentrations of .12 ug/L and .16 ug/L, respectively; however, Plaintiffs respond that the Facility inaccurately reported the underlying laboratory results, which indicated copper concentrations of .12 **m**g/L (or 120 µg/L) and .16 **m**g/L (or 160 µg/L) from Discharge Points 002 and 003. Compare Opp. at 10-11; Mensher Decl., Ex. 11 at 3 with Reply at 13-14; Second Mensher Decl., Ex. 2 at 21, 37. Defendants assert that lab report was not "produced by Defendant" as stated in the Second Mensher Declaration and that the parties have not stipulated to its authenticity. (Sur-Reply at 7, n.4.) The Court agrees that Plaintiffs have not laid an adequate foundation for the lab report in the Second Mensher Declaration. At the same time, the Court believes this is a mere oversight on Plaintiffs' part and queries whether Defendants can, in good faith, challenge the authenticity of the report.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

- a copper sample of 120 µg/L from Discharge Point 002, taken on February 8, 2013 (SUF 56);
- a copper sample of 160 µg/L from Discharge Point 003, taken on February 8, 2013 (SUF 57); and
- a TSS sample of 190 mg/L from Discharge Point 003, taken on February 8, 2013 (SUF 58).

In an excerpt from the 2013-2014 Annual Storm Water Monitoring Report, MMLLC reported concentrations of copper and TSS that were above the NPDES effluent limitations. (Docket No. 226 [Declaration of Allison M. LaPlante, Exs. A & B].)

**B. QUARTERLY REPORTS**

Defendants also reported data relevant to the pending lawsuit in its quarterly monitoring reports.

In Defendants' Quarterly Monitoring Report for July-September 2011, Defendants reported an E. Coli sample of 300/100 mL from Discharge Point 003, taken on September 8, 2011. (SUF 44.)

In Defendants' Quarterly Monitoring Report for October-December 2011, Defendants reported an oil and grease sample of 16 mg/L, a fecal coliform sample of >=1,600/100 mL, and an e. coli sample of >=1,600/100 mL, all taken from Discharge Point 003 on October 13, 2011. (SUF 45-47.)

In Defendants' Quarterly Monitoring Report for April-June 2012, as to Discharge Point 003, Defendants reported a lead sample of .049 mg/L taken on April 19, 2012, the average monthly effluent limitation for lead for the month of April 2012 as .049 mg/L, a lead sample of .081 mg/L taken on May 3, 2012, and a lead sample of .034 mg/L taken on May 30, 2012. (SUF 52-55.)

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

### C. SETTLEMENTS WITH THE BOARD

SFINC and MMLLC each separately entered Stipulated Orders on Settlement Offers (in September 2008 and June 2013, respectively) in which they agreed to pay fines to the RWQCB for violations of the Individual Permits. (SUF 11.[3])

### D. THE PRESENT LAWSUIT

Based on the monitoring reports, Plaintiffs allege in their fourth cause of action that Defendants' discharges from the Facility routinely exceed the Individual Permits' effluent limitations. On April 20, 2012, Plaintiffs gave notice of the violations alleged in the Complaint. (SUF 12.[4]) On June 27, 2012, Plaintiffs filed this lawsuit. (Docket No. 1.)

## II.
## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and material facts are those "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"As the party with the burden of persuasion at trial, [Plaintiffs] must establish beyond controversy every essential element" of their fourth cause of action under the Clean Water Act. So. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003) (citation omitted). Once the moving party satisfies its initial burden, the nonmoving party must set forth specific

---

[3] Defendants object to the Stipulated Orders on the grounds that they are "inadmissible settlement communications" under Federal Rule of Evidence 408. That rule, however, only applies to settlement offers and negotiations "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408. Plaintiffs' use of the publicly available Stipulated Orders does not fall under either category. For example, the settlements reflect the identity of the entities who bore responsibility for the operation of the facility, the scope of the permits under which the facility operates, and the understanding of the facility's operator regarding its obligation to comply with permit requirements. As such, Defendants' objection is **OVERRULED**.

[4] Rather than attaching the April 20, 2012 notice letter to a declaration, Plaintiffs cite to their Complaint, which attaches a copy of the letter. The Court agrees that the letter has not been authenticated, however, as with the lab report, the Court queries whether Defendants can challenge the letter's authenticity in good faith.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

facts showing that there is a genuine issue for trial. Id. ("[The non-moving party] can defeat summary judgment by demonstrating the evidence, taken as a whole, could lead a rational trier of fact to find in its favor.") (citations omitted).

Both parties must support their factual positions by "citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.
## DISCUSSION

### A. Plaintiffs' Have Standing to Bring This Citizen Suit

Plaintiffs' members have significant aesthetic, cultural, and recreational interests in the health of the Santa Clara River, the wildlife that relies on the River, and the habitat it supports. (SUF 13.) Despite asserting evidentiary objections to the declarations supporting SUF 13, Defendants state the fact is "[u]ndisputed" and that they "have never challenged the standing of Plaintiffs." (Resp. to SUF 13.) Nor have Defendants disputed that "Plaintiff organizations' purposes are germane to the interests sought to be protected in this suit." (SUF 17.) The Court therefore concludes that Plaintiffs have standing to bring this citizen suit.

### B. The Clean Water Act and Permit System

The objective of the Clean Water Act is to restore and maintain the "chemical, physical and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). In accordance with that objective, § 301(a) of the Clean Water Act makes unlawful "the discharge of any pollutant by any person," unless in compliance with a permit issued under the NPDES. 33 U.S.C. §§ 1311(a), 1342; Envtl. Prot. Agency v. California ex rel. State Water Resources Control Board, 426 U.S. 200, 205 (1976). "An NPDES permit serves to transform generally applicable effluent limits and other standards . . . into the obligations . . . of the individual discharger." Id.

"[A] permittee violates the CWA when it discharges pollutants in excess of the levels specified in the permit, or where the permittee otherwise violates the permit's terms." Natural Resources Defense Council, Inc. v. County of Los Angeles, 725 F.3d 1194, 1204 (9th Cir. 2013); 40 C.F.R. § 122.41(a) ("Any permit noncompliance constitutes a violation of the Clean

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

Water Act and is grounds for [an] enforcement action"). The Clean Water Act authorizes citizen suits "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1). The Act imposes strict liability for NPDES violations. See Santa Monica Baykeeper v. Kramer Metals, Inc., 619 F.Supp.2d 914 (C.D. Cal. 2009), citing Hawaii's Thousand Friends v. City & County of Honolulu, 821 F.Supp. 1368 (D. Haw. 1993) (noting that because the Clean Water Act imposes strict liability, issues of fault do "not absolve the violator from penalties, although [a lack of fault] might mitigate the amount of the penalties assessed").

Accordingly, to establish a violation of the Act, Plaintiffs need only prove that Defendants violated the terms and conditions of their NPDES permit. The parties agree that the Individual Permits govern the Facility. The court's task is to interpret the Individual Permits like any other contract. Natural Resources Defense Council, 725 F.3d at 1204. "If the language of the permit, considered in light of the structure of the permit as a whole, "is plain and capable of legal construction, the language alone must determine the permit's meaning." Id. at 1204-05 (citation omitted). "If, however, the permit's language is ambiguous, we may turn to extrinsic evidence to interpret its terms." Id. at 1205.

### C. The Facility's Individual Permits

The Individual Permits contain numerous restrictions and limitations on the Facility's discharges. At issue in this motion are the numeric effluent limitations, which limit the maximum discharge of specific pollutants. Section I.B.4 of the 2005 and 2008 permits and Section IV of the 2011 permit identify the final effluent limitations that apply to all discharges from the Facility. (Mensher Decl., Ex. 1 at 13; Ex. 2 at 16; Ex. 3 at 13.) Plaintiffs contend that the text of the Individual Permits is clear and that Defendants' monitoring reports demonstrate that certain pollutants exceed the numeric effluent limitations set in the Individual Permits. (SUF 3, 9, 10.)

If "monitoring data shows that the level of pollutants in federally protected water bodies exceeds those allowed under the Permit, then, as a matter of permit construction, the monitoring data conclusively demonstrate that the County Defendants are not 'in compliance' with the Permit conditions. Thus, the County Defendants are liable for permit violations." Natural Resources Defense Council, 725 F.3d at 1207; see also Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1492 (9th Cir. 1987) (violations reported in self-monitoring reports constitute "conclusive evidence of an exceedance of a permit limitation").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

### D. The Individual Permits Cover Storm Water

The principal issue presented in this motion is whether the effluent limitations found in the Individual Permits apply to discharges of storm water. Plaintiffs contend that the Individual Permit establishes effluent limitations for both wastewater and storm water. Defendants contend that those effluent limitations apply only to discharges of non-storm wastewater. (Resp. to SUF 3, 9, 10.) This section addresses the numerous flaws in Defendants' analysis.

#### 1. Benchmarks Versus Effluent Limitations

Defendants urge the Court to take an "individualized and flexible approach" to evaluate permit compliance because discharges that exceed EPA benchmark levels do not violate the Clean Water Act. In support of this argument, Defendants rely on the analysis in Santa Monica Baykeeper v. Kramer Metals, Inc., 619 F.Supp.2d 914 (C.D. Cal. 2009), a non-precedential district court decision.

In Kramer Metals, the issue was whether EPA benchmark levels, which are guidelines in analyzing compliance with the Clean Water Act, were objective measures such that a scrap metal recycling facility's storm water discharges in excess of the benchmarks constituted a violation of the Clean Water Act. Id. at 920-22. After reviewing the EPA Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity ("MSGP"), the court concluded that benchmark values are not effluent limitations and that plaintiff in that case did not even "argue that Kramer's storm water discharges were in excess of a reportable quantity." Id. at 920. After reviewing the relevant general permit and pertinent regulations, the district court concluded that "[t]here are no numeric effluent limitations for scrap recycling facilities set forth either in 40 C.F.R. Subchapter N or in the MSGP." Id. at 923-24 (holding that "samples in excess of [EPA] benchmarks do not necessarily constitute a violation of the General Permit"). Plainly Kramer Metals is readily distinguishable because, unlike this case, it did not involve an alleged violation of effluent limitations in a Individual Permit issued for the facility in issue. The court in that case simply held that, where there were no effluent limitations established for scrap metal facilities like Kramer Metals, the court would not import EPA benchmarks as objective measures of compliance with the Clean Water Act. In this case, there is no dispute that the Individual Permits set forth effluent limitations, not "benchmarks."

Defendants then point to the RWQCB's May 13, 2010 letter to Mr. Thomas Edgar, the Facility's Director of Administration, which referenced "benchmarks," not effluent limitations, in connection with the Facility's storm water discharges. (Declaration of Thomas Edgar, Ex. A.) The Court has reviewed the May 13, 2010 letter, entitled "Annual Report Review - Benchmark

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

Value Exceedance: NPDES General Permit (Permit) for Storm Water Discharges Associated With Industrial Activity (Order No. 97-03 DWQ; NPDES No. CAS000001), WDID# 4 191008031." Id. The letter refers to the general permit, not the Individual Permits at issue in this motion. Id. at 2 ("If you fail to implement or upgrade your BMPs and amend your SWPPP, pursuant to § 13385 of the California Water Code, you are subject to enforcement action, including administrative civil liability (penalties), for your violation(s) of the General Permit."). Defendants have not shown how failure to comply with the General Permit bears any relevance to, or should be read to excuse, violations of the Individual Permits. There is no logic to their argument that the absence of a similar RWQCB letter in the record pertaining to the Individual Permits does not "demonstrate[] that the Regional Board does not apply the effluent limitations to Defendants' storm water discharges." (Sur-Reply at 6.) On the contrary, the evidence in the record indicates that the Board separately and independently evaluates compliance with each permit.

### 2. The 2005 and 2008 Individual Permits' Reference to "Wet Weather Conditions" Is Not Ambiguous

In their Sur-Reply, Defendants argue that the 2005 and 2008 Individual Permits do not apply effluent limitations to storm water discharges because "the phrase 'wet weather conditions' means conditions with an inch or less of rain" and "[a]ccording to the findings of the 2005 NPDES Permit and the 2008 NPDES Permit, the Facility does not begin to discharge storm water runoff until there is an inch or more of rain." (Sur-Reply at 3.) Defendants conclude that these phrases, found at different points in the permit, somehow demonstrate that the permit does not establish effluent limitations for storm water discharges.

Nothing in the plain language of the 2005 and 2008 Individual Permits supports Defendants' contorted argument. First, Defendants make much of a paragraph from the section of the permits entitled "Description of Wastes Discharged and Outfalls," which states that the Facility "discharges up to 1.52 million gallons per day (mgd) of wastewater, and up to 2.5 million gallons of storm water runoff during storm events when the rainfall exceeds one inch, through Discharge Serial Nos. 001, 002, and 003[.]" (Mensher Decl., Ex. 1 at 5, Ex. 2 at 5.) Defendants claim this paragraph somehow defines the point at which rainfall is "capable of producing storm water runoff" to create discharge. (Sur-Reply at 3.) In other words, rain of less than an inch produces no runoff, but once it reaches the one inch level, it produces 2.5 million gallons of runoff. The argument fails to take into account a number of variables including the rate of the rain fall. One can easily imagine that a half inch of rain that fell in 15 minutes would create substantially more runoff than an inch of rain that fell at a steady rate over a 24 hour period. The cited passage merely indicates an "up to" amount of discharge for rain of a certain

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

amount, but says nothing about the minimum level of rainfall necessary to "trigger" storm water runoff. See Declaration of Allison M. LaPlante ¶ 4, Ex. E (Docket No. 226) (September 3, 2008 email from environmental consultant to Regional Board, explaining that the statement is "simply meant to relate rainfall in inches to volume of storm water discharged from the park"). This comment indicates that, even if the Facility experiences less than an inch of rainfall, any resulting storm water runoff is clearly still subject to the permit regulations.

Nevertheless, Defendants attempt to manufacture an ambiguity in the permit language by pointing to a sentence in the "Final Effluent Limitations" section, which states, "[T]he effluent limitations established in this Order are applicable to discharges during both dry and wet weather conditions[.]" (Mensher Decl., Ex. 1 at 14; Ex. 2. at 17.) Defendants seize on the undefined phrase "wet weather conditions," which they argue means "conditions with an inch or less of rain." (Sur-Reply at 3.) This reading is both unsupported and unreasonable. Based on the plain language of the permit, the effluent limitations apply regardless of the weather conditions, whether wet or dry. Defendants provide no rational explanation for how that idea can be stretched to define what constitutes "dry" as opposed to "wet" weather. Putting aside Defendants' misreading of the "Description" section of the permits, there is no support for Defendants' narrow interpretation of "wet weather conditions" as distinguishable from rainfall producing storm water runoff.[5] As explained above, regardless of quantity discharged, storm water is storm water.

Common sense also supports the application of effluent limitations to all discharges. For example, a facility in the midst of a drought may try to avoid liability for exceeding the effluent limitations by arguing that their discharged pollutants are more highly concentrated because the discharges are not being diluted by the average expected rainfall. The language of the permit — stating that effluent limitations apply "during both dry and wet weather conditions" — forecloses such an argument. Although Defendants appreciate the "unpredictable nature of rain," they assert that storm water requires "at least [] 1" of rain" and conclude that "it would not make sense to apply the effluent limitations to storm water discharges." (Sur-Reply at 6.) Not so. Defendants' evidence regarding how much rainfall is needed to result in a discharge misses the point. See, e.g., Declaration of David Dixon ¶ 10 (Docket No. 233-12) (concluding that

---

[5] Defendants state they have deposed several of the Regional Board's staff members who each "had a different definition of the phrase 'wet weather conditions,'" but did not include this evidence because they thought it would be inappropriate in a sur-reply. (Sur-Reply at 2, n.2.) The Court sees no need to review those deposition transcripts because the plain language of the Individual Permits simply does not lend itself to the ambiguity Defendants attempt to create. However one defines "wet weather conditions," the permit establishes effluent limitations for storm water run off as well as for waste water discharges.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

approximately .35 to .6 inches of rainfall will result in a storm water discharge; Declaration of Frederick Giroux ¶ 5 (Docket No. 234-1) ("Assuming only storm water (i.e., rainfall) flows into the Interceptor, then there would have to be 0.51 inch of rainfall for there to be a discharge from 001."). No one disputes that Defendants' self-reported exceedances were taken following events that produced a discharge. The only sensible reading of the plain language of the permit is one that includes all discharges in both dry and wet weather conditions.

Defendants' assertion that the effluent monitoring requirements in Attachment T apply only to "wastewater" and not "storm water" is likewise unfounded. The Individual Permits explain that Discharge Points 001, 002, and 003 carry both wastewater and storm water "into a storm drain thence to the Santa Clara River." (See, e.g., Mensher Decl., Ex. 1 at 5, Ex. 3 at 1 [including "storm water runoff" under "effluent description" for all three discharge points].) The effluent monitoring requirements in Attachment T state that a "sampling station shall be established for each point of discharge" and that "samples shall be collected after the wastewater is discharged via [a lined or an unlined] tributary to the Santa Clara River, but prior to discharging into the Santa Clara River." (Def. Request for Judicial Notice, Ex. 2 at 53.) At this point, the storm water has been commingled with the wastewater from other sources. Indeed, the rationale for effluent limitations for discharges of oil and grease, TSS, settleable solids, phenols and turbidity was that "these pollutants have the potential to be present in storm water runoff in general." (Second Declaration of Daniel P. Mensher, Ex. 1 at 19.)

Finally, that wastewater also includes storm water is confirmed by Rosario Aston's deposition testimony that "storm water is included in the discharge through outfall 001, 002, and 003." (Declaration of Ryan C. McKim, Ex. 1, Aston Dep. 130:1-2; see also Aston Dep. 131:13-15 [the Facility "included the storm water in their application as their discharge. So in the effluent limitation, it includes the storm water."].) To claim that the 2005 and 2008 Individual Permits "do not contain requirements for testing effluent limitations in storm water discharges" (Sur-Reply at 4, emphasis in original) mischaracterizes Ms. Aston's testimony. Defendants can point to no evidence exempting storm water, or distinguishing it from other sources, such as irrigation runoff, midway washdown, or water attraction overflow. The numeric effluent limitations apply to storm water runoff.[6]

---

[6] The Court rejects Defendants' convoluted "notice of Plaintiffs' legal theories" argument for the reasons set forth in this section; namely, that the Individual Permits do not distinguish between non-storm water and storm water discharges.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

### E. Effect of Interim Effluent Limitations

For some pollutants, the 2005 Permit established "interim limits," which expired on June 2, 2010. Declaration Daniel Mensher, Ex. 1 at 8 ("The interim limits are applicable from the date of adoption of the Order through June 2, 2010, after which, the Discharger shall demonstrate compliance with the final effluent limitations."). For example, for copper, the chart identifying interim daily effluent limitations from Discharge Points 001 and 003 lists "32" and "240," respectively. (See Mensher Decl., Ex. 1 at 17.) Discharge Point 002 has dash marks ("--").

Defendants claim the dash marks mean they could discharge at will during the interim period. (Opp. at 9 ["In other words, during the interim period, there was no effluent limitation for copper discharged from Discharge Point 2."].) Defendant raises the point, but no one actually argues, that the dash marks could mean "no copper (i.e., zero) discharges were permitted during the interim period." (Opp. at 10.) Defendants claim that "Ms. Aston testified that the dash marks mean that there is no limit for the effluent" (Sur-Reply at 7), but the excerpts of her deposition transcript do not include the tables ("Table 6, Table 7, and Table 8") that she was referencing in providing her testimony. (McKim Decl., Ex. 1, Aston Dep. 119:9-16.)

The only reasonable interpretation of the dash marks given the nature of "interim" limitations and the goals of the permit is that there was no need for an interim effluent limit for copper from Discharge Point 002, but that the final limitation for copper from Discharge Point 002 (39.2) was in effect from the date of issuance of the Permit. (Mensher Decl., Ex. 1 at 15.) Thus, Defendants' challenges to SUF 30, 36, and 38 regarding copper from Discharge Point 002 not violating the interim effluent limits because there were no such limits are rejected.

### F. Plaintiffs' Have Carried Their Burden of Establishing that Defendants' Violations of the Individual Permits are "Ongoing" as to Copper and TSS

Citizens may prevail in NPDES enforcement actions only where the violation is "ongoing" and not one "wholly past." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 64. A citizen plaintiff may prove ongoing violations either "(1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." Natural Res. Def. Council v. Sw. Marine, Inc., 236 F.3d 985, 998 (9th Cir. 2000). "The court will find a violation 'ongoing' by comparing self-reported exceedances before the complaint was filed and afterwards. If the same parameter is exceeded, or a violation recurs and the cause has not been completely eradicated, then the violation will be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

deemed 'ongoing' and liability will attach." Sierra Club v. Union Oil Co. of California, 716 F.Supp. 429, 433-34 (N.D. Cal. 1988) (granting partial summary judgment and rejecting Union Oil's claim that violations were not "ongoing" because it "ha[d] not lately reported an exceedance").

Defendants claim that their violations are "wholly past." However, as Plaintiffs point out, "Defendants do not argue that their Permit violations of copper and TSS are wholly past . . . as they have admitted to violating their Permit for copper and TSS *after* Plaintiffs filed their Complaint." (Reply at 15.) With respect to lead, Plaintiffs state that "lead continues to appear in Defendants' effluent today. SSUF 69," but there is no fact number 69 in their separate statement. As for e. coli, fecal coliform, oil, and grease, Defendants claim to have used "employee training" to prevent discharges. Defendants state that "the fact that years have gone by without incident should create the inference that Magic Mountain LLC's remedial actions are working." (Sur-Reply at 9.)

It is clear that the copper and TSS violations are not wholly past and, in fact, have been continuing for quite some time, including in the February 2014 samples. (Docket No. 226, Exs. A & B.) Defendants submit the Declaration of R. Bruce Thomas, a civil engineer with the consulting firm that assists the facility in managing their legal obligations under the Clean Water Act, who states that MMLLC "self-reported . . . elevated levels of TSS and Copper in stormwater discharges that exceeded their NPDES numerical limitations in February 2014 as a matter of extra precaution." Thomas Decl. ¶¶ 1-3 (Docket No. 233-11). Thomas further states that this self-reporting was "not an admission that [MMLLC's] stormwater discharges were regulated by its NPDES permits, but rather was done as a matter of being particularly cautious in light of the ongoing litigation[.]" Id. ¶ 4. Thomas' declaration does not create a genuine issue of material fact because MMLLC's motivations for reporting the exceedances are irrelevant to whether elevated levels of TSS and copper were present. Liability should attach to the copper and TSS violations.

It appears Plaintiffs omitted the evidentiary support for the continuing violation as to lead, and therefore have not carried their burden on summary judgment as to lead. The discharges of e. coli, oil, and grease appear to have been one-off violations that have not recurred since this action was filed. The Court will not grant summary judgment as to liability for the discharges of lead, e. coli, oil, and grease.

/ / /

**LINK: 131**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-05600 GAF (MANx) | Date | December 3, 2014 |
|---|---|---|---|
| Title | Wishtoyo Foundation v. Magic Mountain LLC et al | | |

**IV.**

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for partial summary judgment as to the fourth cause of action is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.