Daniel Cooper (SBN 153576)
Email: daniel@sycamore.law
Hannah Mathieson (SBN 358967)
Email: hannah@sycamore.law
SYCAMORE LAW, INC.
1004B O'Reilly Avenue
San Francisco, CA 94129
Tel: (415) 360-2962

Erina Kwon (SBN 235079)
Email: erina@lawaterkeeper.org
Benjamin Harris (SBN 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street, Suite 250
Los Angeles, CA 90012
Phone: (310) 394-6162

Attorneys for Plaintiffs
LOS ANGELES WATERKEEPER,
FRIENDS OF THE SANTA CLARA RIVER, and
WISHTOYO FOUNDATION

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WISHTOYO FOUNDATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MAGIC MOUNTAIN LLC, et al., <br><br> Defendants. | Case No.: 2:12-cv-05600-SVW-MAN <br><br> [proposed] **SECOND CONSENT DECREE** <br><br><br> Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387 |

## CONSENT DECREE

The following Consent Decree ("2026 Consent Decree") is entered into by and between Plaintiffs Wishtoyo Foundation and its Ventura Coastkeeper program, Los Angeles Waterkeeper, Friends of the Santa Clara River (collectively "the Environmental Groups" or "Plaintiffs"), the Defendants Magic Mountain, LLC and Six Flags Theme Parks, Inc. (collectively "Magic Mountain" or "Defendants"). The entities entering into this 2026 Consent Decree are each an individual "Settling Party" and collectively "Settling Parties."

**WHEREAS,** the approximately 260-acre Magic Mountain amusement park facility is located at 26101 Magic Mountain parkway in Valencia, California (hereinafter "Facility");

**WHEREAS,** as part of its operations, the Facility discharges wastewater and stormwater into the Santa Clara River;

**WHEREAS,** the Facility's discharges are authorized and governed by National Pollutant Discharge Elimination System ("NPDES") Permit No. CA0003352, Order No. R4-2011-0029 ("Individual Permit") and, the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq. ("Clean Water Act" or "CWA"), Sections 301(a) and 402(a)-(d), (e), (i)-(k), and (o), 33 U.S.C. §§ 1311(a)-(d), (e), (i)-(k), and (o);

**WHEREAS,** Defendants' Individual Permit includes any renewals, reissuances, or issuances of that Permit that occur during the life of the Consent Decree;

**WHEREAS,** on June 27, 2012, Plaintiffs filed a complaint under section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), against Defendants in the United States District Court, Central District of California (Case No. 2:12-cv-05600-SVW-MAN) entitled *Wishtoyo Foundation, et al. v. Magic Mountain, LLC, et al.*, ("Complaint");

**WHEREAS,** the Parties negotiated a Consent Decree ("2015 Consent Decree") resolving the allegations set forth in the Complaint without further

proceedings and the Court subsequently entered a commensurate Order on March 26, 2015;

WHEREAS, Plaintiffs allege that Magic Mountain has failed to comply with the 2015 Consent Decree and filed a Motion for Contempt with this Court on February 11, 2026;

WHEREAS, Defendants deny they have violated the 2015 Consent Decree;

WHEREAS, the Wishtoyo Foundation is a 501 (c)(3) non-profit public benefit grassroots corporation organized under the laws of the State of California. The Wishtoyo Foundation's mission is to preserve, protect, and restore Chumash culture, the culture and history of coastal communities, cultural resources, and the environment;

WHEREAS, Ventura Coastkeeper is a program of the Wishtoyo Foundation. Ventura Coastkeeper's mission is to protect, preserve, and restore the ecological integrity and water quality of Ventura County's inland water bodies, coastal waters and watersheds;

WHEREAS, Los Angeles Waterkeeper ("LA Waterkeeper") is a 501(c)(3) non-profit public benefit corporation organized under the laws of the state of California, with its main office in Los Angeles, California;

WHEREAS, LA Waterkeeper is dedicated to the preservation, protection, and defense of the rivers, creeks, and coastal waters of Los Angeles County from all sources of pollution and degradation;

WHEREAS, Friends of the Santa Clara River ("FSCR") is a 501(c)(3) non-profit, public interest organization formed in 1993 dedicated to the protection, enhancement, and management of the resources of the Santa Clara River;

WHEREAS, the Settling Parties agree that it is in the Parties' mutual interests to replace the 2015 Consent Decree with the 2026 Consent Decree to set forth terms and conditions appropriate herein without further proceedings and to ensure compliance;

**NOW, THEREFORE, IT IS HEREBY STIPULATED BETWEEN THE PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1. The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the CWA, 33 U.S.C. § 1365(a)(1)(A).

2. Venue is appropriate in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the Facility where the alleged violations took place is located within this District.

3. The Complaint states a claim upon which relief may be granted against Defendants pursuant to Section 505 of the CWA, 33 U.S.C. § 1365.

4. Plaintiffs have standing to bring this action.

5. The Court shall retain jurisdiction over this action for purposes of interpreting, modifying, or enforcing the terms of this Consent Decree, or as long thereafter as necessary for the Court to resolve any motion to enforce this 2026 Consent Decree.

**I.     OBJECTIVES**

6. It is the express purpose of the Settling Parties through this Consent Decree to further the objectives of the Clean Water Act, to resolve issues relating to Plaintiffs assertions that Magic Mountain is not in compliance with the Individual Permit, the CWA, and the requirements of the 2015 Consent Decree. These objectives include compliance with the provisions of this 2026 Consent Decree, compliance with the terms and conditions of the Individual Permit and compliance with the CWA as it applies to the Facility.

7. In light of these objectives and as set forth fully below, Defendants agree to comply with the provisions of this Consent Decree, terms and conditions of the IGP, and all applicable sections of the CWA at the Facility.

## II.   DEFINITIONS

8.     Unless otherwise expressly defined herein, terms used in this 2026 Consent Decree, which are defined in the CWA or in regulations or rules promulgated under the CWA, have the meaning assigned to them in the statutes or regulations or rules. Whenever terms listed below are used in this Consent Decree, whether or not capitalized, the following definitions apply:

a.     "BMPs" means Best Management Practices.

b.     "2026 Consent Decree" means this 2026 Consent Decree and any attachments or documents incorporated by reference.

c.     "Day" means a calendar day. In computing any period of time under this Consent Decree, where the last day of such period is a Saturday, Sunday, or Federal or State Holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or Federal or State Holiday.

d.     "Reporting Year" means the period from July 1 of a given calendar year to June 30 of the following calendar year.

e.     "SMARTS" means the California State Water Resources Control Board's Stormwater Multiple Application and Report Tracking System.

f.     "Maintenance Yard" means that area depicted on Exhibit 1 attached hereto.

g.     "Park Area" means that area depicted on Exhibit 2 attached hereto.

h.     "The Facility" means that area depicted on Exhibit 3 attached hereto.

i.     "2015 Consent Decree" means Dkt. No. 283, filed on March 26, 2015 settling *Wishtoyo Found. et al., v. Magic Mountain, et al.,* Civil Case No.: CV-12-05600-SVW-MAN (C.D. Cal. 2015).

5

j.    "IGP" means the General Permit for Stormwater Discharges Associated with Industrial Activities NPDES No. CAS000001, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ.

k.    "Individual Permit" means Waste Discharge Requirements for Magic Mountain, LLC, Six Flags Magic Mountain Order No. R4-2011-0029, NPDES No. 0003352.

l.    "Wastewater" means wastewater as defined in the Individual Permit.

m.    "Wastewater Segregation Program" means Magic Mountain's plan to prevent untreated wastewater from discharging to the Santa Clara River by  installing conveyance and storage infrastructure to intercept and convey wastewater  either to the Publicly Owned Treatment Works ("POTWs") under an Industrial Wastewater Permit or to treat and discharge wastewater to the 003 Discharge Point in accordance with the then-existing Individual Permit.

n.    "SWPPP" means Storm Water Pollution Prevention Plan as described in the IGP.

o.    "QSE" means Qualifying Storm Event, defined as a precipitation event: (1) that produces a discharge from at least one of the Facility's discharge points; (2) that is preceded by 48 hours with no discharge from any of the Facility's discharge points; and (3) during which at least 0.25 inches of rain has fallen in a 24-hour period, as determined by the Facility's on-site rain gauge.

p.    "Pollutant(s)" is defined in accordance with the Clean Water Act, 33 U.S.C., § 1311(b)(2).

q.    "Rare Discharge" means no discharge up to and including during the 5-year, 24-, 48-, and 72-hour rainfall events, 3.76, 4.83, and 5.50 inches respectively.

## III.    COMPLIANCE MEASURES

9.    Magic Mountain shall conduct an early action program beginning immediately upon the date of entry of the 2026 Consent Decree according to the schedules set forth in Sections A – D below.

10.    Magic Mountain shall develop a plan to eliminate Maintenance Yard and Park Area on-site trash compactors or, alternatively, implement covering, curbing, secondary containment and/or discharge to the POTW to eliminate stormwater runoff from the trash compactors to the greatest extent operationally feasible. Any BMPs adopted under the Maintenance Yard and Park Area on-site trash compactor plan shall be included in the respective then-current SWPPP.

11.    "To the greatest extent operationally feasible" as applied to the plan to eliminate stormwater runoff from the trash compactors means implementation of a plan that eliminates stormwater runoff from the trash compactors, or if less than complete elimination of stormwater runoff, to the most environmentally protective standard operationally feasible, following a comprehensive, and quantitative as appropriate, assessment of technical regulatory, biological, cultural, aesthetic, economic, and other factors to determine the operational feasibility of implementation to that standard. A conclusion that implementing a program to the required design standard is operationally infeasible requires documentation assessing technical, biological, cultural, aesthetic, economic, and other factors demonstrating in full the reasoning for such conclusion.

12.    Magic Mountain shall develop a program to implement BMPs for the diesel fueling area consistent with the IGP to limit or eliminate spillage or leakage from contact with stormwater. Any BMPs adopted under the diesel fueling area program shall be included in the then-current SWPPP.

13.     Magic Mountain will develop a pavement repair program to repair significant degrading, cracked, and damaged paved surfaces in the Maintenance Yard. Any BMPs adopted under the pavement repair program shall be included in the then-current SWPPP.

14.     Magic Mountain shall develop a program to design and install perimeter control measures to prevent Maintenance Yard stormwater runoff from discharging to the channel adjacent to the Maintenance Yard ("003 Channel") except from outfalls designed in the then-current SWPPP. Any BMPs adopted under the 003 Channel runoff prevention program shall be included in the then-current SWPPP.

**A.     MAINTENANCE YARD MONITORING PROGRAM**

15.   Magic Mountain shall conduct monitoring of the Maintenance Yard consistent with the requirements of the IGP and the Maintenance Yard-specific SWPPP.

**B.     MAINTENANCE YARD STORM WATER POLLUTION PREVENTION PLAN**

16.   SWPPP Revisions: Defendants shall develop and implement a SWPPP for the Maintenance Yard consistent with the requirements in the IGP and submit the complete, updated SWPPP to Plaintiffs within thirty (30) days of entry of this 2026 Consent Decree.

17.   Plaintiffs shall provide Magic Mountain with recommendations, if any, within twenty-one (21) calendar days of its receipt of the Maintenance Yard SWPPP.

18.   Magic Mountain shall incorporate Plaintiffs' recommendations into the Maintenance Yard SWPPP or, alternatively, provide a separate written rationale explaining why any of the recommendations were not accepted and/or incorporated, and provide a final Maintenance Yard SWPPP to Plaintiffs within twenty-one (21) days of receipt of any recommendations. The Parties agree to work in good faith to resolve any disputes with respect to the Maintenance Yard SWPPP.  Following final agreement on the Maintenance Yard SWPPP, Defendants shall submit the Maintenance Yard SWPPP to the Regional Water Quality Control Board.

19.   The Maintenance Yard SWPPP must be developed in accordance with the SWPPP requirements detailed in the IGP.

20.   In addition to the SWPPP requirements detailed in the IGP, the Maintenance Yard SWPPP shall include the following elements:

i.   A map documenting stormwater drainage pathways and discharge points specific to the Maintenance Yard;

ii.   Identification of BMPs to address all exposed sources of stormwater pollutants, as defined by 33 U.S.C., § 1311(b)(2), in the Maintenance Yard;

iii.   The location of well-stocked spill kits in proximity to any release point of potentially polluting liquid materials;

iv.   Protocols requiring unauthorized non-stormwater discharges of all pollutants, including but not limited to petroleum and petroleum derivatives, anywhere in the Maintenance Yard be cleaned up as soon as possible, but at the latest beginning the day after the observation of the spillage or leakage;

v.   Implementation of housekeeping measures to minimize sediment tracking and material exposure consistent with the IGP;

vi.   A cleaning and operational program for lubricant areas designed to prevent oil spills outside the containment area;

vii.   All decommissioned vehicle dismantling shall be conducted indoors or under canopies with berms or with other BMPs to prevent pollutant exposure to stormwater;

viii.   All outdoor equipment and vehicles in the maintenance area that reside permanently therein shall be routinely inspected for leaks; and

ix.   All batteries shall be moved into designated covered and secondarily contained storage or properly disposed of.

21. Upon completion and adoption of the Maintenance Yard SWPPP, Magic Mountain will conduct a Maintenance Yard-specific SWPPP training for maintenance and personnel. Training materials and rosters and certification records will be maintained onsite and made available during a site inspection unless precluded by any law, rule or regulation, but may be provided with redaction of personal information.

22. Magic Mountain shall make all practicable efforts to completely implement all BMPs required by the Maintenance Yard SWPPP on or before October 1, 2026. In any event, all BMPs required by the Maintenance Yard SWPPP shall be fully implemented and installed by October 1, 2027. If the BMPs require permits, those permits will be applied for within 2 months after the approval of the SWPPP by the Plaintiffs, and construction of those BMPs will be started within 90 days of obtaining the required permits. Magic Mountain shall notify Plaintiffs of completion of a constructed BMP pursuant to Section H quarterly reporting requirements of this Consent Decree.

## C.   FACILITY-WIDE MONITORING PROGRAM

23. Magic Mountain shall monitor the Facility consistent with the requirements of the then-current Individual Permit except those areas functioning under the IGP. Areas operating under IGP coverage must conduct monitoring in accordance with the IGP requirements.

## D.   PARK AREA STORM WATER POLLUTION PREVENTION PLAN

24. The Park Area SWPPP must be developed in accordance with the SWPPP requirements detailed in the IGP.

25. In addition to the SWPPP requirements detailed in the IGP, the Park Area SWPPP shall contain, at a minimum, the following elements:

    a. Specification of a sweeping protocol including locations and frequency;

10

  b. Update locations for installation of catch basin inserts and linear filter controls;

  c. Specification of the media to be employed in catch basin inserts and linear filters;

  d. Specification of a protocol for the use of linear filter controls that maximize their effectiveness;

  e. Specification of maintenance protocols for catch basin inserts and linear filter controls;

  f. Protocol requiring covers for trash and recycling dumpsters;

  g. Training schedule to train personnel on the above referenced protocol; and

  h. Identification of locations needing erosion control and implementation of controls.

26. <u>Additional SWPPP Revisions</u>: On or before July 31, 2026, Magic Mountain shall revise and update its SWPPP to incorporate any additional storm water pollution control measures implemented at the Park Area.

27. SWPPP revisions shall be drafted as outlined in the IGP within 30 days whenever significant revision(s), as defined in the IGP, to the SWPPP are required and that draft will be submitted to Plaintiffs for review within fourteen (14) days thereafter. Plaintiffs shall provide Magic Mountain with comments, if any, within twenty-one (21) calendar days of its receipt of the SWPPP Revision. Magic Mountain shall incorporate Plaintiffs' comments into the SWPPP revision or, alternatively, provide a separate written rationale explaining why any of the recommendations that were not accepted and/or incorporated within twenty-one (21) days of Plaintiffs' comments, if any.

**E. MAINTENANCE YARD INFILTRATION AND SEGREGATION DESIGN**

28. Magic Mountain shall design and install an infiltration basin or gallery to manage runoff from the Maintenance Yard potentially excluding the two areas

containing industrial activities indicated in Exhibit 1 designed as No Exposure Certification (NEC) in the then-current Maintenance Yard SWPPP.

29. The Maintenance Yard infiltration project shall be designed to infiltrate stormwater to the greatest extent operationally feasible to infiltrate to the Rare Discharge standard based on a continuous simulation model using historic rainfall records, including an evaluation of stormwater runoff produced by the 5-year, 24-, 48-, and 72-hour rainfall events, 3.76, 4.83, and 5.50 inches, respectively. If Magic Mountain concludes that infiltrating these quantities of runoff is operationally infeasible, it shall quantitatively document the reasons for this conclusion and present and justify an alternative design basis for providing the maximum operationally feasible infiltrations.

30. "To the greatest extent operationally feasible" as applied to the design standards for Maintenance Yard infiltration basins means implementation of the infiltration basin to the required design standard, or if less than the required design standard, to the most environmentally protective standard operationally feasible, following a comprehensive, and quantitative as appropriate, assessment of technical, regulatory, biological, cultural, aesthetic, economic, and other factors to determine the operational feasibility of implementation to that standard. A conclusion that implementing a program to the required design standard is operationally infeasible requires documentation assessing technical, biological, cultural, aesthetic, economic, and other factors demonstrating in full the reasoning for such conclusion.

31. Magic Mountain shall specify Maintenance Yard infiltration pretreatment BMPs and incorporate Maintenance Yard infiltration pretreatment BMPs into the Maintenance Yard's SWPPP following installation of the infiltration system.

32. Magic Mountain shall present the design and associated documentation of the Maintenance Yard stormwater runoff infiltration plan to Plaintiffs for approval

or recommendations for modification within ninety (90) days of the date of entry of this Consent Decree.

33.   Plaintiffs shall provide Magic Mountain with recommendations and comments, if any, to ensure the Maintenance Yard stormwater runoff infiltration plan complies with the requirements set out in this subsection within twenty-one (21) days of its receipt of the plan.

34.   Magic Mountain shall incorporate Plaintiffs' recommendations and comments into the Maintenance Yard stormwater runoff infiltration plan or, alternatively, provide a separate written rationale explaining why any of the recommendations were not accepted and/or incorporated, and provide a final plan to Plaintiffs within twenty-one (21) days of receipt of any recommendations or comments.

35.   Magic Mountain shall begin construction of the Maintenance Yard infiltration facility, once agreed to between the Parties, within one hundred twenty (120) days of issuance of all required permits.

### F.    PARK AREA INFILTRATION DESIGN

36.   Magic Mountain shall identify locations in the Park Area where drywells, infiltration basins, bioinfiltration swales, and/or infiltration galleries to the greatest extent operationally feasible will be installed.

37.   Areas in this design include: locations in the Facility that do not now or will not mingle with wastewater after implementation of the Wastewater Segregation Program in the Park Area.

38.   Magic Mountain shall conduct field infiltration testing utilizing the appropriate equipment, including but not limited to backhoe test pits, hollow-stem auger drill rig borings, and percolation and falling-head infiltration testing. Results will be used to evaluate soil permeability, depth to groundwater, and suitability for shallow infiltration systems or drywells.

13

39. Magic Mountain shall conduct a hydrology assessment to properly size the Park Area infiltration systems. Magic Mountain will perform engineering analyses based on measured infiltration rates and existing site drainage characteristics, considering runoff volumes and peak flow rates, long-term maintenance needs, and potential siting constraints.

40. The plan shall identify locations for each infiltration type, each runoff-contributing area and its size, the size of each identified infiltration facility, and drainage conveyances to deliver runoff.

41. Stormwater infiltration for the Park Area shall be designed to infiltrate or treat using biofiltration stormwater to the 85% 24-hour storm as defined in the 2015 Consent Decree. No more than 10% of stormwater generated by the Park Area shall be treated via bioinfiltration, excluding areas where biofiltration is a pretreatment step prior to infiltration. If Magic Mountain concludes that infiltrating or treating through biofiltration these quantities of runoff is operationally infeasible, it shall quantitatively document the reasons for this conclusion and present and justify an alternative design basis for providing the maximum operationally feasible retention. Magic Mountain shall complete the infiltration/biofiltration plan for the Park Area and submit the plan to Plaintiffs for recommendations and comment, within one hundred eighty (180) days of the date of entry of this Consent Decree.

42. "To the greatest extent operationally feasible" as applied to the design standards for Park Area infiltration and biofiltration program  means implementation of the infiltration and/or biofiltration features to the required design standard, or if less than the required design standard, to the most environmentally protective standard operationally feasible, following a comprehensive, and quantitative as appropriate, assessment of technical, regulatory, biological, cultural, aesthetic, economic, and other factors to determine the operational feasibility of implementation to that standard. A conclusion that implementing a program to the required design standard is operationally infeasible requires documentation assessing

technical, biological, cultural, aesthetic, economic, and other factors demonstrating in full the reasoning for such conclusion.

43.   Plaintiffs shall provide Magic Mountain with recommendations and comments, if any, within thirty (30) days of its receipt of the plan.

44.   Magic Mountain shall incorporate Plaintiffs' recommendations and comments into the Park Area infiltration/biofiltration plan or, alternatively, provide a separate written rationale explaining why any of the recommendations or comments were not accepted and/or incorporated, and provide a final comprehensive Park Area infiltration plan within thirty (30) calendar days of receipt of any recommendations and comments.

### G.   IMPLEMENTATION OF WASTEWATER SEGREGATION AND DISCHARGE ELIMINATION

45.   <u>Facility-Wide Segregation Design</u>. Magic Mountain will segregate wastewater that currently mingles with stormwater. Wastewater includes, but is not limited to, water related to splash out from water rides, water associated with spray treatments of the wooden roller coaster Apocalypse and washdown maintenance from the midway.

46.   Within thirty (30) days of completion of the stormwater infiltration/biofiltration and wastewater segregation projects, Magic Mountain will incorporate the infiltration/biofiltration and segregation program into the SWPPP and will consider this adoption a revision as set forth in section D.

47.   Implementation of the wastewater segregation and POTW discharge programs may require permitting from the Regional Water Quality Control Board, the Los Angeles County Public Works Department, and Los Angeles County Sanitation District.

48.   Magic Mountain shall timely provide all  documents, plans, data, or other information, excluding those that may be privileged under applicable law including but not limited to Evidence Code §1152, provided to or received from the

Regional Water Quality Control Board, the Los Angeles County Public Works Department, and Los Angeles County Sanitation related to implementation of the wastewater segregation and POTW discharge programs. Magic Mountain shall include courtesy copies of these communications to Plaintiffs in quarterly reports per Section H of this Consent Decree.

49.   In the event that Magic Mountain is unable to obtain the required permits for the segregation and sanitary discharge programs agreed upon under the 2026 Consent Decree within 365 days of the date of entry of this 2026 Consent Decree, Magic Mountain shall develop a pollution reduction plan for wastewater that discharges to the Santa Clara River. The pollution reduction plan shall be provided to Plaintiffs within 455 days of date of entry of this 2026 Consent Decree and will propose a management and/or treatment approach and implementation schedule for reducing pollutants in wastewater sources including discharges from water attraction maintenance and splash-out from water attractions. The pollutant reduction plan will be designed to eliminate discharges of wastewater from the Facility or to ensure that all discharged wastewater shall comply with the then-current Individual Permit effluent limitations. The treatment approach shall include an evaluation of installing a reverse osmosis ("RO") treatment system or other measures to reduce chlorides to meet the Individual Permit effluent limitation for chlorides. Plaintiffs will provide recommendations within thirty (30) days of receipt of the pollution reduction plan. The pollution reduction program shall be implemented within 365 days after the Plaintiffs' approval of the pollution reduction plan.

**H. PLAINTIFFS' SUPPORT OF MAGIC MOUNTAIN'S PERMITTING EFFORTS**

50.   Plaintiffs will support in good faith Magic Mountain's permit application process, including at least one joint or separate meeting with each agency, and one letter of support to each agency.

51. Plaintiffs will support in good faith Magic Mountain's transition from the Individual Permit to the Industrial General Permit, including at least one joint or separate meeting with each agency, and one letter of support to each agency.

52. Final implementation of the wastewater segregation project shall be complete within 360 days of issuance of all required permits.

**I.     REPORTING REQUIREMENTS**

53. Plaintiffs may conduct an annual inspection of the Facility annually through the life of the Consent Decree.

54. Defendants agree to provide Plaintiffs, via email, with photo documentation of the QSE stormwater discharges along with data documenting the flow rate of the discharge. If Defendants make engineering changes that cease all discharges from any of the Discharge Points, Defendants shall notify Plaintiffs of those changes and, within ten (10) days of implementing the changes, provide Plaintiffs with design and engineering plans demonstrating such Discharge Points will no longer be used.

55. Quarterly Reports. Beginning immediately upon the date of entry and on April 30, July 31, October 31, and January 31, Magic Mountain shall send a written quarterly report to the Plaintiffs. This report shall document:

    a. Rainfall data from Magic Mountain's on-site rain gauge during any rainy seasons (defined for the purpose of this Consent Decree as October 1 through May 31) for which the 2026 Consent Decree is in effect;

    b. Copies of all 2026 Consent Decree and Individual Permit compliance and monitoring data, including inspection reports.

56. During the life of this 2026 Consent Decree and upon request, Defendants shall copy Plaintiffs on all documents and communications, excluding those that may be privileged under applicable law including but not limited to Evidence Code §1152,  in relation to stormwater runoff at the Facility that are

submitted to the Regional Board, and the State Board. Any correspondence related to NPDES compliance, excluding those that may be privileged under applicable law including but not limited to Evidence Code §1152, received by Magic Mountain from any regulatory agency, State or local agency, county, or municipality shall be provided to Plaintiffs within fourteen (14) days of receipt by Defendants.

57.    During the life of this 2026 Consent Decree, Plaintiffs may request document production from Defendants including but not limited to documents regarding stormwater sampling, stormwater monitoring, personnel training, infiltration and segregation of stormwater, the Maintenance Yard monitoring program, the Maintenance Yard Pollution Prevention Plan, the Facility-Wide monitoring program, the Facility-Wide Storm Water Pollution Prevention Plan, stormwater management engineering and design, communications with any State agency, local agency, county, or municipality. and other information implicated by this 2026 Consent Decree. Upon receipt of Plaintiffs' request, Defendants will produce the requested documents to Plaintiffs within 30 days, subject to objections as though said request was made pursuant to FRCP Rule 34.

### J. ENVIRONMENTAL MITIGATION, LITIGATION FEES AND COSTS, STIPULATED PENALTIES, PAYMENTS AND INTEREST

58.    <u>Environmental Mitigation Payment</u>. Magic Mountain agrees to make Environmental Mitigation Payments totaling $2,000,000.00 consistent with Attachment A to this Consent Decree.

59.    Environmental Mitigation Payment funds will be used to support environmental projects related to preservation of the aquatic environment in the Santa Clara River, and designed to analyze, reduce, prevent, and/or otherwise mitigate the ecological or public health effects of industrial stormwater and/or non-stormwater discharges. The payment shall be mailed via certified mail or overnight delivery to: Friends of the Santa Clara River, PO Box 7713, Ventura, CA 93006.

60.   Magic Mountain shall make a stipulated payment of $5,000 ("Stipulated Penalty") for each exceedance of any numeric effluent limitation of a stormwater sample in the Facility's currently applicable NPDES permit beginning 730 days after entry of this 2026 Consent Decree. Stipulated payments will be used to support environmental projects related to water quality in the Santa Clara River, and designed to analyze, reduce, prevent, and/or otherwise mitigate the ecological or public health effects of industrial stormwater and/or non-stormwater discharges. The payment shall be mailed via certified mail or overnight delivery, with notice to Plaintiffs, to: Friends of the Santa Clara River, PO Box 7713, Ventura, CA 93006.

61.   Plaintiffs' Fees and Costs. Defendants shall pay $221,871.83 to reimburse Plaintiffs for costs, including expert/consultant fees and costs, and partially reimburse Plaintiffs for reasonable attorneys' fees incurred as a result of Magic Mountain's non-compliance with the 2015 Consent Decree and negotiating additional settlement terms between the Parties. The payment in full shall be made within seven (7) calendar days of the date of entry of the 2026 Consent Decree and delivered by certified mail or overnight delivery made payable to: Sycamore Law Attorney Client Trust Account 1004B O'Reilly Ave., San Francisco, CA 94129.

### K. COMPLIANCE OVERSIGHT.

62.   Magic Mountain shall pay $15,000 per year for the life of the 2026 Consent Decree to fund compliance oversight by the Plaintiffs' consultants and counsel. The first payment shall be made within seven (7) calendar days of the date of entry of the 2026 Consent Decree, and subsequent payments shall be made on or before January 30 each year thereafter and delivered by certified mail, overnight delivery or electronic funds transfer made payable to: Los Angeles Waterkeeper, c/o Senior Attorney, Los Angeles, CA 90012. The payment shall note "Magic Mountain – Compliance Payment."

## L. TERMINATION OF CONSENT DECREE.

63. This 2026 Consent Decree shall terminate after the conclusion of any proceeding or dispute resolution to enforce the 2026 Consent Decree initiated prior to five (5) years after the date of entry and after the completion of any payment or other affirmative duty required by this Consent Decree, but in no case less than four (4) years from the date of entry.

## IV.    DISPUTE RESOLUTION

64. This Court shall retain jurisdiction over this matter for the term and for the purposes of enforcing the terms and conditions of the 2026 Consent Decree, and adjudicating all disputes among the parties that may arise regarding any of the provisions of this 2026 Consent Decree upon the failure of dispute resolution as set forth herein. The Court shall have the power to enforce this 2026 Consent Decree with all available legal and equitable remedies, including contempt.

65. Meet and Confer. Either party to this 2026 Consent Decree may invoke the dispute resolution procedures of this Section IV by notifying the other party in writing of the matter(s) in dispute and of the disputing party's proposal for resolution. The Parties shall then meet and confer in an attempt to resolve the dispute no later than 14 days from the date of the notice. The Parties have at least fourteen (14) days from the date on which they meet and confer to resolve the dispute.

66. If the Parties cannot resolve a dispute within at least fourteen (14) days of the initial meet and confer, either party may initiate mediation with ADR Services, Inc. or any other agreed to provider of said services.

67. If, after good faith efforts have been made to resolve a dispute through this dispute resolution and the Parties have not reached a resolution after ninety (90) days of the invocation of the mediation process, either party may seek resolution by the Court by filing a motion before the United States District Court for the Central

20

District of California. The Parties shall jointly apply to the Court for an expedited hearing schedule on the motion, if both parties deem it is necessary.

68.   In resolving any dispute arising from this Consent Decree before the Court, the prevailing Party shall be entitled to seek fees and costs incurred pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and applicable case law interpreting such provisions, or as otherwise provided for by statute and/or case law.

## V.    MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

69.   <u>Plaintiffs' Waiver and Release of Defendants</u>. In consideration of the above, upon the date of entry of this 2026 Consent Decree, Plaintiffs, on their own behalf and on behalf of their officers and directors, release Defendants, their officers, directors, managers, employees, members, parents, subsidiaries, divisions, affiliates, predecessors, successors or assigns, agents, attorneys and consultants and other representatives, from and waives all claims related to Magic Mountain's noncompliance with the Individual Permit, 2015 Consent Decree, and 2026 Consent Decree.

70.   <u>Defendants' Waiver and Release of Plaintiffs</u>. In consideration of the above, upon the date of entry of this 2026 Consent Decree, Defendants, on their own behalf and on behalf of their officers, directors, employees, parents, subsidiaries, affiliates and each of their successors or assigns, release Plaintiffs, their officers and directors, managers, employees, members, parents, subsidiaries, divisions, affiliates, predecessors, successors or assigns, agents, attorneys and consultants and other representatives, from and waives all claims related to the Individual Permit, 2015 Consent Decree, and 2026 Consent Decree.

71.   Nothing in this 2026 Consent Decree limits or otherwise affects the Parties' rights to address or take any position that they deem necessary or appropriate in an informal or formal proceeding before the State Board Water Resources Control

Board, Los Angeles Regional Water Quality Control Board, Environmental Protection Agency, or any other judicial or administrative body on any matter relating to Defendants' compliance at the Facility with the IGP or the Clean Water Act occurring or arising after the date of entry of the 2026 Consent Decree.

72.  Force Majeure. Defendants shall notify Plaintiffs pursuant to the terms of this paragraph, when timely implementation of the requirements set forth in this Consent Decree becomes impossible, despite the timely good-faith efforts of Defendants, due to circumstances beyond the reasonable control of Defendants or their agents, and which could not have been reasonably foreseen and prevented by the exercise of due diligence by Defendants. In no circumstances shall a claim of inability to pay be considered force majeure.

a.  If Defendants claim impossibility, they shall notify Plaintiffs in writing within twenty-one (21) days of the date that Defendants reasonably concluded that a circumstance that caused or would cause a violation of this Consent Decree based on said conclusion of impossibility. The notice shall describe the reason for the non-performance and specifically refer to this Section. It shall describe the anticipated length or time the delay may persist, the cause or causes of the delay, the measures taken or to be taken by Defendants to prevent or minimize the delay, the schedule by which the measures will be implemented, and the anticipated date of compliance. Defendants shall adopt all reasonable measures to avoid and minimize such delays.

b.  The Parties shall meet and confer in good faith concerning the non-performance and, where the Parties concur that performance was or is impossible, despite the timely good faith efforts of Defendants, due to its circumstances beyond the control of Defendants that could not have been reasonably foreseen and prevented by the exercise of due diligence by Defendants, the Parties may establish new deadlines or modify the Consent Decree to take into consideration the impossibility of ending non-performance.

c.   If Plaintiffs disagree with Defendants' notice, either party shall have the right to invoke the Dispute Resolution Procedure pursuant to Section XXX above. In such proceeding, Defendants shall bear the burden of proving that any delay in performance of any requirement of this Consent Decree was caused or will be caused by force majeure and the extent of any delay or need for modification of this Consent Decree as may be attributable to such circumstances.

## VI.   MISCELLANEOUS PROVISIONS

73.   <u>Facility Changes</u>. Any changes in the Facility's layout, stormwater management, outfalls, maintenance areas, bone yards, or any other structure referenced in this Consent Decree shall not relieve Defendants of their obligations in this Consent Decree, unless explicitly agreed to in writing by Plaintiffs.

74.   <u>Counterparts</u>. This 2026 Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopy and/or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

75.   <u>Authority</u>. The undersigned representatives for Plaintiffs and Defendants each certify that s/he is fully authorized by the party whom s/he represents to enter into this 2026 Consent Decree. A Party's signature to this 2026 Consent Decree transmitted by facsimile or electronic mail shall be deemed binding.

76.   <u>Construction</u>. The language in all parts of this 2026 Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the Permit, the Clean Water Act, or specifically herein. The captions and paragraph headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

77.   <u>Mutual Drafting and Construction</u>. It is hereby expressly understood and agreed that the Settling Parties jointly drafted this Consent Decree. Accordingly, the Parties hereby agree that any and all rules of construction to the effect that ambiguity

23

is construed against the drafting party shall be inapplicable in any dispute concerning the terms, meaning, or interpretation of this Consent Decree.

78. Choice of Law. The laws of the United States shall govern this Consent Decree.

79. Severability. In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of enforceable provisions shall not be adversely affected.

80. Effect of Consent Decree. Plaintiffs do not, by their agreement to this Consent Decree, warrant or aver in any manner that Defendants' compliance with this Consent Decree will constitute or result in compliance with any federal or state law or regulation. Nothing in this Consent Decree shall be construed to affect or limit in any way the obligation of Defendants to comply with all federal, state, and local laws and regulations governing any activity referenced in this Consent Decree.

81. Modification of the Consent Decree. Upon its entry by the Court, this Consent Decree shall have the force and effect of a final judgment. This Consent Decree, and any provisions herein, may not be changed, waived, or discharged, unless by a written instrument, signed by all Parties. Approval by the Court of any changes is required only if a modification materially changes the terms of this Consent Decree or materially affects Defendants' ability to meet the requirements or objectives of this Consent Decree.

82. Full Settlement. This Consent Decree constitutes a full and final settlement of this matter.

83. Integration Clause. This is an integrated Consent Decree. This Consent Decree, along with any attachments incorporated into the Consent Decree by reference, is intended to be a full and complete statement of the terms of the agreement between the Settling Parties and expressly supersedes any and all prior oral or written agreements, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

84. <u>Correspondence</u>. All notices required herein or any other correspondence pertaining to this 2026 Consent Decree shall be, to the extent feasible, sent via electronic mail transmission to the e-mail addresses listed below, or if electronic mail is not feasible, then by certified U.S. mail with return receipt, or by hand delivery to the following addresses:

| <u>If to Plaintiffs:</u> | <u>If to Defendants:</u> |
|---|---|
| Los Angeles Waterkeeper | Six Flags Magic Mountain |
| Erina Kwon | 26101 Magic Mountain Parkway |
| Benjamin Harris | Attn: Park President |
| 360 E 2nd St., Suite 250 | Valencia, CA 91355 |
| Los Angeles, CA 90012 | |
| Email: erina@lawaterkeeper.org | |
| Email: ben@lawaterkeeper.org | |
| Phone: (310) 394-6162 | |
| | |
| Wishtoyo Foundation/Ventura Coastkeeper | |
| Tevin Schmitt | |
| Mati Waiya | |
| 9452 Telephone Road #432 | |
| Ventura, CA 93004 | |
| tschmitt@wishtoyo.org | |
| matiwaiya@wishtoyo.org | |
| Tel: (805) 667-7818 | |
| | |
| Friends of the Santa Clara River | |
| Candice Meneghin | |
| P.O. Box 7713 | |
| Ventura, CA 93006 | |
| contact@fscr.org | |
| Tel: (805) 628-2250 | |
| | |
| <u>With copies to:</u> | <u>With copies to:</u> |
| Daniel G. Cooper (SBN 153576) | Legal Department |
| daniel@sycamore.law | One Cedar Point Dr. |
| Hannah Mathieson (SBN 358967) | Sandusky, OH 44870 |
| hannah@sycamore.law | |
| SYCAMORE LAW, INC. | Steven L. Hoch (SBN 59505) |
| 1004 O'Reilly Avenue, Ste. 100 | shoch@clarkhill.com |

San Francisco, CA 94129
Tel: (415) 360-2962

Clark Hill LLP
555 S. Flower St., 24th Floor
Los Angeles, CA 90074
Tel: (213) 417-5125

Notifications of communications shall be deemed submitted three (3) days after the date that they are postmarked and sent by first-class mail, or immediately after acknowledgement of receipt via email by the receiving party. Any change of address or addresses shall be communicated in the manner described above for giving notices.

85.   The provisions of this Consent Decree apply to and bind the Settling Parties, including any successors or assigns. The obligations created in this Consent Decree are enforceable by this Court at the request of either Party. The Parties certify that their undersigned representatives are fully authorized to enter into this Consent Decree, to execute it on behalf of the Parties, and to legally bind the Parties to its terms.

86.   The Parties shall be bound by this Consent Decree and will not contest its validity in any subsequent proceeding to implement or enforce its terms. By entering into this Consent Decree, Defendants do not admit liability for any purpose as to any allegation or matter arising from this matter.

The Parties hereto enter into this 2026 Consent Decree and submit it to the Court for its approval and entry as a final judgment.

IN WITNESS WHEREOF, the undersigned have executed this Consent Decree as of the date first set forth below.

APPROVED AS TO CONTENT

Dated: May 14, 2026                    By: _____

                                       Bruce Reznik
                                       Executive Director
                                       Los Angeles Waterkeeper


Dated: _____, 2026             By: _____

                                       [NAME OF SIGNER]
                                       [POSITION WITH DEFENDANT]
                                       [DEFENDANT]


APPROVED AS TO FORM

                                       SYCAMORE LAW, INC.


Dated: May 14, 2026                    By:
                                       Daniel Cooper
                                       Attorney for Plaintiffs
                                       Los Angeles Waterkeeper, Wishtoyo
                                       Foundation, and Friends of the Santa
                                       Clara River


Dated: _____, 2026             By: _____
                                       Steven L. Hoch
                                       Attorney for Defendants
                                       Magic Mountain, LLC and Six Flags
                                       Theme Parks, Inc.

**IT IS SO ORDERED.**

27

APPROVED AS TO CONTENT

Dated: May 14, 2026                    By: _____

                                       Erina Kwon
                                       Senior Attorney
                                       Los Angeles Waterkeeper

Dated: _____, 2026             By: _____

                                       [NAME OF SIGNER]
                                       [POSITION WITH DEFENDANT]
                                       [DEFENDANT]

APPROVED AS TO FORM

                                       SYCAMORE LAW, INC.

Dated: May 14, 2026

                                       By: _____
                                       Daniel Cooper
                                       Attorney for Plaintiffs
                                       Los Angeles Waterkeeper, Wishtoyo
                                       Foundation, and Friends of the Santa
                                       Clara River

Dated: _____, 2026             By: _____
                                       Steven L. Hoch
                                       Attorney for Defendants
                                       Magic Mountain, LLC and Six Flags
                                       Theme Parks, Inc.

**IT IS SO ORDERED.**

APPROVED AS TO CONTENT

Dated: May 14, 2026                          By: _____

Erina Kwon
Senior Attorney
Los Angeles Waterkeeper

Dated: May 14, 2026

By: _____
15BD2AA8A2EA416..

John T. Reilly
President & Chief Executive Officer
Six Flags Magic Mountain and Six
Flags Theme Parks, Inc.

APPROVED AS TO FORM

SYCAMORE LAW, INC.

Dated: May 14, 2026                          By:
Daniel Cooper
Attorney for Plaintiffs
Los Angeles Waterkeeper, Wishtoyo
Foundation, and Friends of the Santa
Clara River

Dated: May 14, 2026

By: _____
Steven L. Hoch
Attorney for Defendants
Magic Mountain, LLC and Six Flags
Theme Parks, Inc.

**IT IS SO ORDERED.**

29

**FINAL JUDGMENT**

Upon approval and entry of this Consent Decree by the Court, this 2026 Consent Decree shall constitute a final judgment between the Plaintiff and Defendant.


Dated: May 18, 2026                    CENTRAL DISTRICT OF CALIFORNIA


_____
HONORABLE STEPHEN V. WILSON
United States District Court Judge

30